IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CR-12-258-D |
| | ) | |
| ANDRE LAMARR LAW, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND  ORDER**

This matter comes before the Court upon Defendant Andre Law's Motion to Suppress

Evidence [Doc. No. 14], filed pursuant to Fed. R. Crim. P. 12(b)(3)(C).  The government timely

opposed the Motion.   On February 28, 2013, the Court held an evidentiary hearing at which

Defendant appeared personally and through his appointed counsel, William H. Campbell.   The

government appeared through Assistant United States Attorney Travis Smith.  The Court heard the

testimony of two law enforcement officers: Special Agent Chad Oubre of the Bureau of Alcohol,

Tobacco, Firearms and Explosives (ATF); and Sergeant Greg Bell of the Oklahoma City Police

Department (OCPD).  The Court also received into evidence a copy of a report prepared by Agent

Oubre regarding investigative activities on July 15, 2012.  Defendant's counsel presented oral

argument, and the government adopted its written brief.  Upon consideration of the evidence, the

case record, and the parties' arguments, the Court finds and rules as follows.

**Findings of Fact**

The Indictment charges that on or about July 15, 2012, Defendant knowingly possessed a

firearm and ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  Defendant

moves to suppress seized evidence on which the government will rely to prove this charge.  The

firearm and ammunition at issue were seized from Defendant's person and a vehicle in which he was riding on the date charged, when the car was stopped and detained by Sgt. Bell and a partner. The hearing witnesses testified concerning the events that led to Sgt. Bell's contact with Defendant; their testimony established the following facts pertinent to the Motion, as found by the Court.

Agent Oubre is a four-year member of ATF, assigned for the past two years to assist an OCPD gang unit. Based on his interview of a suspect in a drive-by shooting and other interviews, the unit believed that gang members were purchasing firearms illegally at local gun shows, which are held regularly at the Oklahoma City Fairgrounds. The gang unit then developed a plan for conducting surveillance at gun shows to look for gang members and prohibited persons buying firearms. Illegal purchases can occur at gun shows because vendors include both federal firearm licensees, who are subject to federal rules regarding paperwork and record keeping, and private sellers or personal collectors who are not subject to federal requirements. The protocol for the gang unit program involved undercover agents or detectives in plain clothes working inside the fairgrounds building to observe gun show patrons, and uniformed OCPD patrol officers located outside the building to act on surveillance information and detain persons suspected of illegal activities.

Agent Oubre was working a gun show on July 15, 2012, with approximately ten to fifteen other officers when he observed Defendant Law and a companion, DelMonte Pitts, looking at "machine"-type pistols. Agent Oubre used this term in his testimony to mean handguns with a militaristic look or intimidating appearance, which are popular with gang members. Agent Oubre observed the two men primarily frequenting tables of private vendors, and Defendant Law behaving in a nervous manner; he stood back from the gun tables and looked from a distance, seemingly

2

reluctant to handle the firearms himself. Other officers said their clothing was gang-like, but it was not distinctive in color or insignia. Defendant was wearing cargo shorts with a blue color in the pattern. Light blue clothing is popular with a particular gang present in the Oklahoma City area. After a time, the two men separated. Agent Oubre followed Defendant, and observed him purchase a Taurus pistol from a private vendor with cash and put it in his pocket. Other agents saw Mr. Pitts also purchase a semi-automatic handgun with cash.

After Defendant purchased the gun, he immediately went to the front of the building and rejoined Mr. Pitts, who was speaking with a group of seven or eight individuals by the front door. One member of the group had distinctive tattoos. Another officer checked the tattoos against an OCPD data base, and learned they were associated with a person identified as a gang member and a prohibited individual. Defendant and Mr. Pitts left the gun show together.

Based on what Agent Oubre and detectives had observed inside the gun show, officers stationed outside the building continued surveillance of Defendant and Mr. Pitts. OCPD patrol officers were given a description of the car in which they were traveling, as well as descriptions of their physical appearance. Patrol officers were not given specific orders, but it was suggested that they would initiate a traffic stop and question the individuals.

Sgt. Bell was one of the patrol officers working an overtime shift on July 15, 2012, to make stops for detectives at the gun show. Sgt. Bell had been assigned to the OCPD gang unit for six or seven years, often making high-risk stops and executing warrants. Sgt. Bell and Sgt. High, who was driving their patrol car, received a description of the car in which Mr. Pitts and Defendant were riding, a gray four-door Lincoln MKZ with Texas license plates. Sgt. Bell confirmed Agent Oubre's testimony that he and Sgt. High were not instructed to stop the vehicle based on criminal activity;

he testified they were simply told that they might want to check out the individuals in the vehicle and they should probably make a traffic stop.

The patrol officers caught up with the vehicle in the area of Tenth Street and Portland Avenue.  The vehicle entered interstate highway I-44 going southbound into the flow of moderate traffic, and the officers followed.  The officers observed the vehicle move into the center lane traveling at 55 or 60 miles per hour, within the posted speed limit.  When the driver switched lanes, however, he pulled in closely behind another car so that the space between the two vehicles was within a car-length.  The car the officers were following maintained a close distance to the car ahead of it – approximately 15 to 20 feet – for a span of four or five blocks.  Sgt. Bell testified credibly that, in his opinion, the driver was following too closely because the two cars were too close for safety under the circumstances, which is a traffic violation under Okla. Stat. tit. 47, § 11-310.  The officers initiated a traffic stop by activating their lights when the car moved into the left-hand lane to go eastbound on I-40. The driver of the car complied with their signal and stopped at the first safe opportunity by exiting the highway onto south Agnew.

The patrol officers approached the car simultaneously, Sgt. High on the driver's side and Sgt. Bell on the passenger's side.  Sgt. Bell asked for identification, and the passenger – later determined to be Defendant – said he had no identification.  In response to questions from Sgt. High, the  driver – later determined to be Mr. Pitts – reached for the glove box, and Defendant shifted his leg so the glove box could be opened.  When he moved his leg, Sgt. Bell could clearly see a pistol grip protruding from Defendant's pants pocket.  Sgt. Bell saw the gun within minutes after the officers stopped the car.

Sgt. Bell asked Defendant if he had a gun, and Defendant stated that he did.  Sgt. Bell instructed Defendant to exit the vehicle, and handcuffed him for officer safety and carrying a concealed firearm.  Defendant was searched; the firearm was seized; and Defendant was placed in the patrol car.  When Defendant exited the vehicle, Sgt. Bell also saw bullets located between the passenger seat and the door.  When questioned, Defendant admitted he bought the gun at the gun show, and he had a prior arrest in a drug case.  When the officers checked records, they found that Defendant had a deferred sentence for a drug offense.

### Conclusions of Law

The government bears the burden of proof regarding the validity of a warrantless seizure. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006).  In this case, the government contends the traffic stop was permissible under the Fourth Amendment as an investigative detention governed by *Terry v. Ohio*, 392 U.S. 1 (1968).  To determine whether a *Terry* stop was constitutional, courts ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20.  The same principles govern the legality of a traffic stop.  *See United States v. Whitley*, 670 F.3d 1227, 1232 (10th Cir. 2012); *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011).

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1133-34 (10th Cir. 2009); *see United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008).  For reasonable suspicion to exist, an officer "simply must possess some minimal level

of objective justification for making the stop."  *See Winder*, 557 F.3d at 1134 (internal quotation

omitted).  According to the Tenth Circuit:

> Our precedents leave no room to doubt the validity of a traffic stop based on an
> observed traffic violation.  *See*, *e.g.*, *United States v. Gregoire*, 425 F.3d 872, 876
> (10th Cir. 2005) ("An observed traffic violation or a reasonable suspicion of such a
> violation under state law plainly justifies a stop.").  Observed traffic violations
> necessarily "afford the quantum of individualized suspicion necessary to ensure that
> police discretion is sufficiently constrained."  *Whren v. United States*, 517 U.S. 806,
> 817-18, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

*Id*. at 1135.

In this case, Sgt. Bell testified credibly that he observed what he believed to be the traffic

violation of "following too closely."  *See* Okla. Stat. tit. 47, § 11-310.  This statute provides: "The

driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and

prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of

the highway."  The circumstances described by Sgt. Bell – traveling at highway speeds within a car

length behind another vehicle in moderately heavy traffic – provided reasonable suspicion that such

a violation had occurred.  Therefore, the Court finds that the traffic stop of the vehicle in which

Defendant was riding immediately prior to his arrest on July 15, 2012, was constitutionally

permissible.

Turning to the question of whether the scope of the traffic stop was reasonably related to the

circumstances that initially justified it, the focus of the Court's inquiry is "'the reasonableness of

the traffic stop in light of both the length of the detention and the manner in which it was carried

out.'"  *Polly*, 630 F.3d at 997 (quoting *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir.

2007)).  It is well settled that "officers may ask questions outside the scope of the traffic stop so long

as the questions do not appreciably prolong the length of the stop."  *Id*. (internal quotation omitted).

In this case, the Court finds that Sgt. Bell's detention of Defendant was reasonable in length and the manner in which it proceeded. Sgt. Bell simply approached the vehicle in which Defendant was riding and asked him for identification. As he was talking to Defendant, Mr. Pitts reached for papers in the glove compartment, presumably because Sgt. High asked him for vehicle registration, "which the police are unquestionably permitted to do in the course of a traffic stop." *See Polly*, 630 F.3d at 998. Sgt. Bell testified credibly that, as Defendant moved his leg to permit Mr. Pitts to open the compartment, Sgt. Bell could plainly see a pistol grip of a gun in Defendant's pocket. Even without this observation, it is well established that a police officer may ask a person to step out of a vehicle, and may ask about the presence of guns or weapons during a traffic stop. *See id.*; *see also Valenzuela*, 494 F.3d at 889-90. Further, Defendant admitted he had a gun when asked by Sgt. Bell. Under the circumstances, Sgt. Bell was justified in placing Defendant in handcuffs and removing the gun from his pocket, both for officer safety and based on probable cause to believe that a gun carrying violation under Okla. Stat. tit. 21, § 1272(A) had occurred.[1] Sgt. Bell saw the ammunition in plain view when Defendant opened the car door and exited the vehicle. In short, the Fourth Amendment was not implicated by Sgt. Bell's conduct toward Defendant.

Although the duration and scope of Sgt. Bell's investigative detention of Defendant was reasonable, Defendant argues that the traffic stop was unlawful because it was simply a ruse for investigating a weapons offense based on surveillance at the gun show. However, the fact that a traffic stop was initiated for other investigative purposes "is legally irrelevant. In determining

---

[1] In July, 2012, this statute and the Oklahoma Self-Defense Act (Okla. Stat. tit. 21, § 1290.1 *et seq.*), prohibited any person from carrying a concealed handgun on his person, whether loaded or unloaded, without a valid state-issued license, and the person was required to have possession of the license and a valid Oklahoma driver license or photo identification "at all times when in possession of an authorized pistol." *See* Okla. Stat. tit. 21, § 1290.8(B) (West 2002).

whether a traffic stop is constitutional, the officer's 'subjective intent or good faith do[es] not affect the reasonableness of the stop.'" *Polly*, 630 F.3d at 997; (quoting *United States v. Orduna-Martinez*, 561 F.3d 1134, 1137 (10th Cir. 2009); *see also Winder*, 557 F.3d at 1134 ("an officer's actual motivations or subjective beliefs and intentions are, quite simply, irrelevant") (internal quotation omitted). Therefore, Defendant's argument does not alter the Court's conclusion that no Fourth Amendment violation occurred.

## Order

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence [Doc. No. 14] is DENIED.

IT IS SO ORDERED this 7th  day of March, 2013.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE